Johnny SMITH, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000144–MR.

Supreme Court of Kentucky.

March 22, 2012.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Courtney J. Hightower, Assistant Attorney General, Office of the Attorney General, Frankfort, KY, for appellee.

Opinion of the Court by Justice SCOTT.

A Greenup Circuit Court jury found Appellant, Johnny Matthew Smith, guilty of first-degree robbery and unauthorized use of a motor vehicle. The jury also found him to be a second-degree persistent felony offender (PFO). For these crimes, Appellant received a thirty-year prison sentence, was assessed court costs and fines in the amount of $281, and was ordered to pay restitution in the amount of $500. He now appeals as a matter of right, Ky. Const. § 110(2)(b), alleging that (1) he was denied his constitutional right to a speedy trial, (2) the trial court erred in denying his motion for a directed verdict, (3) the trial court erred in assessing court costs and fines, and (4) the trial court erred in ordering him to pay restitution.

## I. BACKGROUND

Around 7:00 p.m. on September 26, 2008, a man robbed K.D.'s Fuel in South Shore, Kentucky at gunpoint. The man was wearing two bandanas: one over the top of his head, and one covering the lower half of his face from the nose down. The store clerk emptied the register and handed the robber approximately $500. Because of the bandanas, the clerk saw only the robber's eyes; however, he observed the robber driving a teal Geo Tracker. The Geo, which was owned by Brian Simpson, was taken from Simpson's place of employment without his knowledge at some point before the robbery, used during the robbery, and recovered a few blocks away later that night.

A customer outside K.D.'s at the time, Lloyd Davis, witnessed the robbery[1] and drove around the fuel station to get the license plate number from the robber's vehicle. As the robber drove past Davis, the two men made eye-contact. The bandana that had been covering the lower half of the robber's face was gone, and Davis recognized Appellant as the robber.[2] Davis then made an anonymous call to the police and gave the dispatcher the Geo's license plate number and a brief description of the vehicle.

Local pawnshop owner, Donnie Townsend, also observed Appellant driving Brian Simpson's Geo Tracker the night of the robbery.[3] Townsend had done business with Appellant and Appellant's wife a few

---

1. K.D.'s is a glass structure, front to back, that Davis could see through.

2. Davis knew Appellant because he had gone to school with Appellant's twin brothers and had been to Appellant's house on a few occasions.

3. Simpson works across the street from Townsend's shop. Townsend testified that he sees the Tracker parked across the street on a daily basis. He knew it was Simpson's Tracker because of the unusual color and because there was no tire on the rim of the spare mounted on the back of the vehicle.

times in the months preceding the robbery, including the day of the robbery. Around 6:45 or 7:00 that evening, Townsend saw Appellant driving the Geo toward K.D.'s.

## II. ANALYSIS

### A. Appellant's Right to a Speedy Trial

Appellant argues that the trial court erred by granting the Commonwealth's motion for a continuance in order to perform DNA testing, thereby delaying the trial for nine months and resulting in a violation of his right to a speedy trial. We disagree. Because the speedy trial analysis is fact-specific and date-oriented, we pause to review the procedural history of this case.

#### 1. Procedural History

On September 28, 2008, two days after the robbery, police arrested Appellant and searched his home. He was released on bond on October 17, 2008 and indicted on December 5, 2008. Appellant's bond was revoked at his January 8, 2009 arraignment for returning to K.D.'s with another person and taunting the clerk who had been robbed by saying, "[w]e've come to rob you, since that's what you are used to." Trial was set for July 6, 2009.

Approximately one month before the scheduled trial date and over eight months after the arrest, the Commonwealth requested DNA testing. On June 11, the court held a hearing on the motion where the defense objected and made its first oral motion for a speedy trial. The court, however, granted the Commonwealth's request notwithstanding the Commonwealth's admission that it would be sur-

prised if the DNA test results would be back by the July 6 trial date.

At approximately 12:15 a.m. on June 19, 2009, two sheriff's deputies went to the Greenup County Detention Center to obtain a DNA sample from Appellant. Although Appellant initially agreed to provide a sample, he ultimately insisted on having his lawyer present. The deputies were unable to contact Appellant's lawyer at that time, and they left without obtaining the DNA sample. Appellant's refusal caused the Commonwealth a four- to seven-day delay.

On June 22, 2009, the Commonwealth moved for a continuance of the trial; it also moved the court to hold Appellant in contempt for refusing to submit to the DNA testing in contravention of a court order. At a scheduled suppression hearing the next day, the Commonwealth informed the court that it had originally wanted to submit the DNA sample for testing on June 19 and had planned to request a rush on the test in an attempt to get the results back by trial. While the court scolded Appellant for not submitting to the sample on June 19, Appellant stated his willingness to submit to the sample that day in court. The Commonwealth declined Appellant's offer and stated that a deputy would obtain the sample later in the week.[4]

Two days later, the Commonwealth informed the court that it would not be able obtain the DNA testing results by the July 6 trial date, due in part to the upcoming holiday weekend. Appellant argued that a continuance would violate his right to a speedy trial. The court pointed to Appellant's initial failure to comply with the court-ordered DNA testing and continued the trial to April 5, 2010.

4. At the suppression hearing, Appellant reminded the court that he was not waiving his constitutional right to a speedy trial.

Appellant submitted a written *pro se* motion in August, reasserting his right to a speedy trial; it was filed the following week. On November 12, 2009, the court amended Appellant's bond to $10,000 cash; he was released later that day on bond with an order to appear in court on March 25, 2010 for a pretrial conference. After Appellant was released from jail in Kentucky, he was arrested and incarcerated in Ohio. As a result of this incarceration, he failed to appear at both his pretrial conference and trial, and the court again had to reschedule his trial. On May 3, 2010, Appellant waived extradition and returned to a Kentucky jail. In June, the court set a final trial date for January 31, 2011—two years and four months after Appellant's original arrest. Additional dates and proceedings will be discussed where relevant.

### 2. Speedy Trial Analysis

■ The Sixth Amendment to the United States Constitution guarantees criminal defendants "the right to a speedy and public trial." This guarantee applies to the states through the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Barker v. Wingo*, 407 U.S. 514, 515, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Klopfer v. North Carolina*, 386 U.S. 213, 222–23, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). The Kentucky Constitution also guarantees criminal defendants "a speedy public trial." Ky. Const. § 11.

■ In determining whether a criminal defendant has been deprived of his right to a speedy trial, we consider four factors: (1) the length of delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530–32, 92 S.Ct. 2182 (1972); *Bratcher v. Commonwealth*, 151 S.W.3d 332, 334 (Ky.2004). "We regard none of the four factors ... as either a necessary or sufficient condition to the finding of a

deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. Bearing in mind that a fundamental right is involved, we must engage in a careful balancing process. *Id.*

### a. Length of Delay

■ The first factor we consider in determining whether Appellant's right to a speedy trial was violated is whether the length of delay was presumptively prejudicial. "The length of delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors...." *Id.* at 530, 92 S.Ct. 2182. We have stated that there is no precise amount of time after which it can be conclusively determined that an accused's speedy trial right has been violated. *McDonald v. Commonwealth*, 569 S.W.2d 134, 136 (Ky.1978). Rather, it "must depend on the particular context of each case ... and [be] balanced against the other factors." *Id.* at 136–37.

### (i) Length

■ We measure the length of delay as "the time between the earlier of the arrest or the indictment and the time the trial begins." *Dunaway v. Commonwealth*, 60 S.W.3d 563, 569 (Ky.2001) (citing *Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975)). Here, Appellant was arrested more than two months prior to his indictment; therefore, the length of delay is measured from time of arrest. From the time Appellant was arrested to the start of his trial, there was a delay of two years and four months.

### (ii) Context

■ Next, we consider the particular context of the case in conjunction with the

length of delay when determining presumptive prejudice. *McDonald*, 569 S.W.2d at 136–37. This is because "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Dunaway*, 60 S.W.3d at 569 (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. 2182). Here, Appellant was charged with first-degree robbery, receiving stolen property, and second-degree PFO. In *Dunaway*, we considered charges very similar to Appellant's—three counts of first-degree robbery and one count of PFO—to be "serious and of moderate complexity." 60 S.W.3d at 569. The length of delay in that case was thirteen and one-half months. *Id.* We concluded that a delay of thirteen and one-half months in a case involving serious charges of moderate complexity was presumptively prejudicial. *Id.*

In light of *Dunaway*, we believe that Appellant's charges are serious and of moderate complexity, and a delay of two years and four months is presumptively prejudicial. *See also Bratcher*, 151 S.W.3d at 344 (eighteen-month delay in complex murder case was presumptively prejudicial). Thus, an inquiry into the other factors is warranted.

### b. Reasons for Delay

The second factor we consider in determining whether Appellant's right to a speedy trial was violated is the reasons for the delay. Here, there are two circumstances relevant to this factor: (1) the trial court's decision to grant the Commonwealth's motion for a continuance, and (2) Appellant's failures to appear at his pretrial conference and trial.

■ In *Barker*, the United States Supreme Court indicated that "different weights should be assigned to different reasons." 407 U.S. at 531, 92 S.Ct. 2182. For example, deliberate attempts to delay trial should be weighted heavily against the prosecution. *Id.* More neutral reasons (e.g., negligence) "should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* Finally, valid reasons (e.g., a missing witness) are justifiable. *Id.*

### (i) The Motion for Continuance

■ The first event relevant to this inquiry is the trial court's decision to grant the Commonwealth's motion for a continuance because the results of the DNA sample could not be completed by the July 6, 2009 trial date. We must therefore analyze the events surrounding the DNA sample and determine how much (if any) weight should be assigned to the court's decision.

The robbery occurred on September 26, 2008, and the sheriffs department began investigating the matter that night. Appellant was arrested and his house was searched two days later. No additional evidence sought to be tested was obtained after September 28, 2008. For eight months after Appellant's arrest, the Commonwealth made no attempt to procure DNA comparison samples. Then, about one month before the July 6 trial date, the Commonwealth moved to obtain DNA samples from Appellant. On June 11, 2009, over Appellant's objections and assertion of his right to a speedy trial, the court granted the motion.

There is some dispute as to whether the DNA test results could have been ready by trial even if Appellant had given a sample on June 19. The Commonwealth admitted initially that it would be "surprised" if the results would be back by the time trial commenced, but later claimed that, had Appellant submitted the sample on June 19, it would have "put a rush on it in an attempt to get the results back by trial."

Appellant disputes whether it logistically could have been completed by then. In any event, as of the June 23 suppression hearing, all parties agreed that the DNA test results could not be completed by the July 6 trial date, and the court granted the Commonwealth's motion for a continuance. The new trial date was set for April 5, 2010—nineteen months after Appellant's arrest.

Although there is no direct evidence that the Commonwealth asked for the DNA samples to deliberately delay trial, it cannot be overlooked that the request came less than one month before the trial was to begin, and over eight months after the crime, arrest, and evidence collection. The record reflects no valid reason (and the Commonwealth offers none) why the DNA samples could not have been collected at a time reasonably calculated to have been processed by the July 6 trial date. We must therefore weigh the continuance in favor of Appellant, because "the ultimate responsibility for [this] circumstance[ ] must rest with the government...." *Id.* at 531, 92 S.Ct. 2182.[5]

### (ii) Appellant's Failures to Appear

Because the length-of-delay factor in this case is measured from arrest to trial, we must discuss the other circumstance germane to delay: Appellant's failures to appear at his March 25, 2010 pretrial conference and April 5, 2010 trial. As previously noted, Appellant failed to appear at both events because he was incarcerated in Ohio on other charges.[6] Appellant has offered no valid reason for his failures to appear. He argues that his incarceration

renders his failure to appear involuntary, and therefore excusable. We disagree.

When the trial court called Appellant's case in court on March 25, 2010—a scheduled pretrial conference date—Appellant was not present. His attorney informed the court that "he ha[d]n't been in contact with [the Department of Public Advocacy] for several weeks," even though staying in contact with his attorney was a condition of Appellant's bond (as was being ready for all court appearances). A bond forfeiture hearing was scheduled, a bail-jumping charge was added to his pending charges, and the judge's notes indicate that he issued another bench warrant. The following week Appellant failed to appear for his April 5 trial due to his incarceration in Ohio. Consequently, the trial was rescheduled for January 31, 2011.

■ The reason for the eight and one-half month delay from April 5, 2010, to January 31, 2011, lies squarely with Appellant. When one fails to appear for trial without good reason, he must bear the burden of any resulting delay and any prejudice that might result from that delay. While out-of-state incarceration may make a failure to appear in court "involuntary" in the loosest of senses, it is not, without more, excusable. Had Appellant contacted his attorney—a condition of his bond—from the Ohio jail, perhaps his attorney could have facilitated extradition or made other arrangements for Appellant to make his scheduled appearances. In any event, under the circumstances of this case we conclude that, for purposes of assigning fault for delay, out-of-state incarceration is not a "valid," justifiable reason for delay

---

5. To be sure, Appellant was at fault for refusing to submit the DNA sample on June 19 when there was a court order requiring it. On balance, though, the delay caused by the court's decision to grant the Commonwealth's continuance weighs in Appellant's favor.

6. Nothing in the record indicates what charges Appellant was being held on in Portsmouth, Ohio, or when he arrived at the jail.

under *Barker*, and the burden of the weight must fall upon Appellant.[7,8]

■ In sum, we hold that the reasons-for-delay factor does not weigh in Appellant's favor. We pause, however, to address Appellant's argument that, even if the trial had commenced on April 5, 2010, he would still have a speedy trial claim.[9] In that case, virtually all of the fault for delay would be attributable to the Commonwealth, and this factor would weigh in favor of Appellant.[10] This, however, ignores the rule that the period of delay is measured in this case from arrest to trial—not the *opportunity* for trial. *See Dunaway*, 60 S.W.3d at 569 (stating that the length of delay "is the time between the earlier of the arrest or the indictment *and the time the trial begins* ) (emphasis added). Accordingly, we must evaluate *all* events causing delay between arrest and trial. Here, both parties are equally at fault in causing the two year and four month delay. Thus, this factor cannot weigh in Appellant's favor.

**c. Asserting the Right to a Speedy Trial**

The third factor we must consider is the accused's demand for a speedy trial. *Id.* at 571. It is undisputed that Appellant asserted his right to a speedy trial, both orally and in writing. This factor deserves some attention, though, because his assertion "is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." *Barker*, 407 U.S. at 531–32, 92 S.Ct. 2182; *see also Dunaway*, 60 S.W.3d at 571. We first note that Appellant asserted his right to a speedy trial immediately when the trial court heard the Commonwealth's motion to obtain the DNA samples. He objected to the samples (citing speedy trial issues), and objected to the Commonwealth's motion for a continuance. Appellant reasserted his right several times, both orally and in writing, over the course of several months. Thus, we must weigh this factor in his favor. *See, e.g., Soto v. Commonwealth*, 139 S.W.3d 827, 844 (Ky.2004) (weighing this factor in the appellant's favor where he made a written demand for a speedy trial).

**d. Prejudice Caused by the Delay**

■ Finally, we must determine how, if at all, Appellant was prejudiced by the delay. The United States Supreme Court identified three interests relevant to this inquiry as the interests the speedy trial right was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility

---

7. We further note that it would be absurd for us to throw out his conviction based, in part, on the fact that he was "fortunate" enough to be in more criminal trouble in another state, rendering him "involuntarily" absent from his required appearances.

8. Appellant also argues that the trial would have been delayed past the April 5, 2010 date anyway because the DNA results were not provided to the defense until April 13, 2010. This is speculative. First, the DNA results were completed on April 1. Presumably, the trial court could have subpoenaed them had that been the only reason for delay. Second, assuming the Commonwealth would have filed a motion for a continuance if it had not received the results by trial, the trial court could have denied the motion and required the Commonwealth to proceed with the other evidence it had, citing Appellant's speedy trial assertions. Ultimately, the DNA comparisons came back as inconclusive.

9. In this he assumes that a nineteen-month delay—September 28, 2008 to April 5, 2010—is presumptively prejudicial.

10. This would not necessarily mean that Appellant would win his speedy trial claim; this factor would still have to be balanced with the others.

that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S.Ct. 2182 (footnote omitted). Of these, the last is considered the most serious. *Id.*

### (i) Prevention of Oppressive Pretrial Incarceration

With respect to the first interest—preventing oppressive pretrial incarceration—*Barker* notes that an accused "is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Id.* (footnote omitted). Imposing these consequences on someone who is presumed innocent until proven guilty is serious. *Id.* The accused in *Barker* was held to. have suffered some prejudice by spending ten months in jail and approximately four years on bond. *Id.*

We consider Appellant's position—twenty months in jail and eight months on bond—to be sufficiently analogous. However, Appellant must bear the burden of any prejudice that he may have suffered due to his incarceration. Appellant was in jail for a total of twenty months. He was originally arrested on September 28, 2008, but he was released on October 17, 2008—less than three weeks after he was originally incarcerated. Appellant only went back to jail on January 8, 2009 because he returned to K.D.'s in December 2008 and taunted the clerk who had been robbed. Appellant's bond was revoked and reset at $100,000, and he remained in jail until he again posted bond on November 12, 2009.[11] On May 3, 2010, after waiving extradition from Ohio, he was back in a Kentucky jail where he remained until his January 2011 trial. Thus, Appellant has only himself to blame for all but three weeks of his twenty months in jail. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 865, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (interpreting *Barker* as standing for the propo-

sition that "interests protected by the Sixth Amendment look to the degree of prejudice incurred by a defendant *as a result of governmental action or inaction*") (emphasis added). Any prejudice he may have suffered must be outweighed by the reason for his incarceration—the violations of his bond.

### (ii) Minimization of Appellant's Anxiety and Concern

■ With respect to the second interest—minimizing an accused's anxiety and concern—*Barker* explains that an accused, even if he is not incarcerated, "is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." 407 U.S. at 533, 92 S.Ct. 2182. However, complaining in general terms about suffering anxiety is "insufficient to state a cognizable claim." *Preston v. Commonwealth*, 898 S.W.2d 504, 507 (Ky.App.1995). We require an affirmative showing of unusual anxiety "which extends beyond that which 'is inevitable in a criminal case.' " *Id.* (citing *Hakeem v. Beyer*, 990 F.2d 750, 762 (3d Cir. 1993)); *accord Dunaway*, 60 S.W.3d at 572. As Appellant has made no such showing, we conclude that this interest has not been violated in any meaningful way, if at all.

### (iii) Possibility of an Impaired Defense

■ We now turn to the third and most important interest bearing on prejudice: the possibility that the defense will be impaired. As we recently stated in *Miller v. Commonwealth*, "speculative and generic claims are insufficient to support a claim of prejudice." 283 S.W.3d 690, 702–03 (Ky.2009); *see also Bratcher*, 151 S.W.3d at 345 ("Conclusory claims about . . . the possibility of an impaired defense

---

11. Appellant's bond was reduced to $10,000 on that date.

are not sufficient to show prejudice."). Accordingly, Appellant must demonstrate *actual* prejudice.

██ Appellant claims that his incarceration impeded his ability to pursue and investigate his defense that another man, Joseph Pelfrey, committed the robbery. Toward the end of June 2009—nine months after his arrest and just weeks before his scheduled trial—Appellant told police that Pelfrey had come to his home and confessed to robbing K.D.'s. Appellant stated that Pelfrey had come to a residence he was at directly after committing the robbery to buy Oxycontin. Deputies from the sheriff's department investigated this claim and interviewed Pelfrey on July 13, 2009.[12]

It is Appellant's contention, apparently, that Pelfrey would trust Appellant, and *only* Appellant, enough to confess to the robbery—that the fact that Pelfrey did not confess to the sheriffs deputies is of no consequence, and that it would have been futile for the Department of Public Advocacy (DPA) to pursue an investigation. Thus, he argues, his incarceration and his curfew condition on bond prejudiced him to the extent that he was hindered from investigating Pelfrey.

We find this argument to be without merit. Appellant was not precluded from interviewing Pelfrey while out on bond, but he never did. The investigators at the DPA were not precluded from interviewing Pelfrey, but they never did. Appellant's attorney apparently never followed up on Appellant's allegation that Pelfrey

confessed to the robbery. There is nothing in the record to show these failures to investigate an alternative suspect were hampered by Appellant's incarceration and subsequent bond conditions. In short, this is a conclusory claim about the possibility of an impaired defense. *Bratcher*, 151 S.W.3d at 345. As stated above, "speculative and generic claims are insufficient to support a claim of prejudice." *Miller*, 283 S.W.3d at 702.

In sum, Appellant suffered some prejudice by his twenty-month incarceration; however, any prejudice suffered thereby is outweighed by the fact that all but three weeks of his twenty months in jail is attributable to Appellant violating the conditions of his bond. Moreover, Appellant failed to show any unusual anxiety and concern necessary for a finding of a violation of that interest. Finally, Appellant suffered no actual prejudice to his ability to prepare a defense. Accordingly, this factor does not weigh in Appellant's favor.

██ Having considered each *Barker* factor individually, we must now weigh them together. First, the delay in bringing Appellant's case to trial was presumptively prejudicial, and sufficient to trigger a *Barker* inquiry. However, Appellant was responsible for half of the delay, so the reasons-for-delay factor weighs neither for nor against him. Although he repeatedly asserted his right to a speedy trial (the third *Barker* factor), he was not prejudiced in any meaningful way by his incarceration (the fourth *Barker* factor): (1) he must bear the burden of any prejudice assumed by a twenty-month incarcer-

---

12. The interview was conducted at the Lebanon Correctional Institute in Ohio, where Pelfrey was incarcerated. The deputies' report stated that "it was very obvious that Pelfrey did not match the description of [Appellant]." Pelfrey told the deputies that he knew Appellant but had not spoken to him in years. He also said that if he had committed the robbery at K.D.'s, he would have confessed to it, claiming that his sentence would have run concurrent with the sentence he was serving, "and both cases would be behind him upon" release. In concluding their report, the deputies stated that "Pelfrey did not match the description of the suspect captured on the surveillance footage regarding this case."

ation, as his behavior accounts for all but three weeks of the twenty months he spent in jail; (2) he made no showing of unusual anxiety and concern; and (3) he suffered no actual prejudice to his ability to prepare a defense. Based on the foregoing, after balancing all four *Barker* factors, we conclude that Appellant's constitutional rights to a speedy trial were not violated.

## B. Directed Verdict

Appellant next argues that a directed verdict should have been granted with respect to both his robbery and unauthorized use of a motor vehicle convictions due to the "extreme unreliability of two purported eyewitnesses." This Court outlined the standard by which a trial court should evaluate a motion for a directed verdict in *Commonwealth v. Benham:*

> [T]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky.1991).

For our purposes, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, ... then the defendant is entitled to a directed verdict of acquittal." *Id.* (*citing Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky.1983)); *see also Beaumont v. Commonwealth,* 295 S.W.3d 60, 67 (Ky.2009). Thus, "there

must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Benham,* 816 S.W.2d at 187–88. However, we reemphasize that an evaluation of the sufficiency of evidence depends on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Beaumont,* 295 S.W.3d at 68 (*citing Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

A review of the evidence presented in this case clearly indicates that the trial court correctly determined that a reasonable juror could fairly find guilt beyond a reasonable doubt. The Commonwealth produced more than a mere scintilla of "evidence of substance." *Benham,* 816 S.W.2d at 187–88. This evidence includes: (1) pawnshop owner Donny Townsend's testimony that he saw Appellant driving Brian Simpson's Geo Tracker toward (and about twenty yards from) K.D.'s, around the time of the robbery; (2) the clerk's testimony that a man wearing bandanas covering his face came in, pointed a gun at his face, and demanded all the money from the register; (3) the clerk's testimony that the robber took about $500, and the robber was driving a teal Geo Tracker; and (4) Lloyd Davis's testimony that he saw Appellant rob K.D.'s, and that just after the robbery he saw Appellant drive by in a teal Geo Tracker with his face uncovered. We find this to be sufficient evidence for a juror to conclude that Appellant committed the charged offenses beyond a reasonable doubt.[13] The trial

---

**13.** Witness credibility is a jury question: *Commonwealth v. Cox,* 837 S.W.2d 898, 900 (Ky.1992) (stating that "it is within the pur-

view of the jury to determine the credibility and weight of her testimony"); *Benham,* 816

court did not err in denying Appellant's motion for a directed verdict.

### C. Assessment of Court Costs and Fines on an Indigent Defendant

 Appellant next argues that the trial court erred when it imposed court costs and fines of $281. Appellant asserts that he is indigent, and that court costs and fines cannot be levied on indigent defendants. This issue is not preserved; however, we invoke our authority under RCr 10.26 and review this issue for palpable error.[14]

For years, this Court has taken the position that the language in KRS 31.110(1)(b), the statute providing for waiver of costs for indigent defendants, controlled over KRS 23A.205(2), which provides the trial court discretion in imposing court costs. *See Edmonson v. Commonwealth,* 725 S.W.2d 595, 596 (Ky.1987). Accordingly, we have previously found it to be a palpable error to impose court costs on an indigent defendant. *See, e.g., Wiley v. Commonwealth,* 348 S.W.3d 570, 574 (Ky.2010).

However, in light of our decision today in *Maynes v. Commonwealth,* 361 S.W.3d 922 (Ky.2012), *Edmonson* is no longer good law. Courts may now impose court costs on an indigent defendant, "unless the court finds that the defendant is a poor person as defined by KRS 453.190(2) and that he or she is unable to pay court costs and will be unable to pay the court costs in the foreseeable future." KRS 23A.205. Thus, we reverse the trial court's imposition of court costs, and remand for a determination of whether Smith is (1) a poor person as defined by KRS 453.190(2), and (2) unable to pay court costs now, and will be unable to pay court costs in the foreseeable future.[15]

### D. The Trial Court's Restitution Order

 Finally, Appellant contends that the trial court erred in ordering Appellant to pay $500 (plus 5% interest) in restitution. Specifically, he argues that the restitution order did not meet the criteria im-

---

S.W.2d at 187 (same). Appellant argues that there is an exception to this rule:

> [T]he power and prerogative of the jury is subject to the quite universal qualification that the jury may not, through sympathy or other reason, arbitrarily or capriciously base its verdict upon a statement as to what occurred or how something happened when it is *opposed to the laws of nature* or is *clearly in conflict with scientific principles,* or base its verdict upon testimony that is *so incredible and improbable and contrary to common observation and experience as to be manifestly without probative value.*

*Coney Island Co. v. Brown,* 162 S.W.2d 785, 787–88 (Ky.1942) (emphasis added). We believe, however, that the evidence and testimony presented by the Commonwealth in this case are not of the sort described in *Coney Island.*

14. Under the palpable error standard, an unpreserved error may be noticed on appeal only if the error is "palpable" and "affects the substantial rights of a party," and even then

relief is appropriate only "upon a determination that manifest injustice has resulted from the error." RCr 10.26. In general, a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." *Ernst v. Commonwealth,* 160 S.W.3d 744, 762 (Ky. 2005). An unpreserved error that is both palpable and prejudicial still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice, unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky.2006).

15. We note here that Smith has been sentenced to thirty years in prison for a violent offense. Pursuant to KRS 439.3401(3), he must serve at least 85% of this sentence before he is eligible for parole or probation. Thus, if he is a "poor person" now, *a fortiori* he will be a poor person for the foreseeable future.

posed by KRS 532.033—identifying to whom, exactly, the restitution was to be paid. Appellant alleges that the order fails to specify whether K.D.'s Fuel is an entity in and of itself that could receive payment, or whether the restitution would be paid to the owner or owners of K.D.'s Fuel. This issue was not preserved for appeal; thus, we evaluate it under the palpable error standard. RCr 10.26.

The restitution statute states, in relevant part, that "[w]hen a judge orders restitution, the judge shall: (1) Order the restitution to be paid to a specific person or organization through the circuit clerk, who shall disburse the moneys as ordered by the court; . . . ." KRS 532.033. The restitution order identifies the beneficiary as "K.D.'s Citgo, Attention Keith Gilbert . . ." and goes on to give an address. We hold that the restitution order is sufficiently specific, and that the payment should be made to K.D.'s Citgo—the entity from which the money was taken. We find no error, palpable or otherwise, in the fact that the payment was directed to the attention of Keith Gilbert.

### III. CONCLUSION

For the foregoing reasons, Appellant's convictions for first-degree robbery, unauthorized use of a motor vehicle, and the PFO determination are affirmed. We likewise affirm the trial court's restitution order. However, we reverse the trial court's order requiring Appellant to pay court costs and fines, and remand for a determination of whether he is a "poor person" under KRS 453.190(2), and whether he will be unable to pay court costs now or in the foreseeable future.

All sitting. All concur.