RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

TERRANCE MILES,

                    *Petitioner-Appellant*,

   *v.*

SCOTT JORDAN, Warden,

                    *Respondent-Appellee*.

> No. 19-5340

─────────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:17-cv-00558—Joseph H. McKinley, Jr., District Judge.

Argued: January 29, 2021

Decided and Filed: February 24, 2021

Before: COOK, GRIFFIN, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Ilana B. Gelfman, JONES DAY, Boston, Massachusetts, for Appellant. Thomas A. Van De Rostyne, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Louis K. Fisher, Kathryn Kimball Mizelle, JONES DAY, Washington, D.C., for Appellant. James C. Shackelford, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Petitioner Terrance Miles claims that the Kentucky Supreme Court erred in adjudicating his federal speedy-trial and ineffective-assistance claims. The district court disagreed and denied his habeas corpus petition. Because the district court appropriately deferred to the Kentucky Supreme Court's reasonable resolutions of Miles's claims, we affirm.

I.

A Kentucky jury convicted Miles of murder, wanton endangerment, tampering with physical evidence, and being a persistent felony offender in the second degree. *Miles v. Commonwealth*, No. 2007-SC-000298-MR, 2009 WL 160435, at *1 (Ky. Jan. 22, 2009). The Kentucky Supreme Court summarized the facts of his crimes:

> On the night of February 27, 2005, Michael Teasley, a bouncer at Club 502, was shot and killed outside the club as he attempted to clear the parking lot after the club had closed. Earlier that same evening, after another bouncer had removed Terrance Miles from the club for smoking marijuana, Miles and Teasley got into a fight. Teasley's wife, Crystal, who also worked at the club, testified that after the fight, Miles grinned and said to her husband, "you might have whipped my ass, but I'm going to get you."

> Officer Frank Hill of the Louisville Metro Police Department, who was working extra security for the club while off duty, observed the fight between Teasley and Miles. While Hill did not witness the actual shooting, he heard the gunshots and then looked in the direction of the gunshots and saw a male running across the parking lot dressed in all dark clothing and wearing a toboggan hat. Officer Hill testified that the man he observed running across the parking lot was the same man who had been fighting with Teasley earlier in the night. Hill gave chase in his patrol car with the assistance of another bouncer and at one point located the suspect behind a dumpster in back of the club. However, Hill eventually lost sight of the suspect.

> A number of items were collected from the crime scene, including a black toboggan hat and a cell phone. The number of the cell phone matched the number Miles gave to Enterprise Rent–a–Car when he switched his rental vehicle the day after the murder.

*Id.* In March 2005, Miles was indicted for Teasley's murder and other charges related to the shooting. *Id.* At that time, he was already in custody on unrelated state charges. Eight months after Miles's indictment, law enforcement sent the toboggan hat recovered at the crime scene to a lab for DNA testing. *Id.* at *2.

Before trial, the prosecutor requested, and the state trial court granted, several continuances. The prosecutor asked for these delays because the lab had not yet returned the DNA results for the hat. In the prosecutor's view, these results were a "vital piece of evidence which could prove to be either inculpatory or exculpatory." *Id.* Miles's counsel did not initially object to the delay and at one point agreed that the results were a "crucial piece of evidence." *Id.* But Miles himself filed a speedy-trial motion and told the court that he viewed the DNA testing as a "stall tactic." The state court denied Miles's pro se motion and others filed by his counsel as the delay continued for about a year after Miles's initial pro se objection. Eventually, the testing results arrived and showed that the hat was "negative for Miles' DNA." *Id.* at *1.

Miles's trial began approximately twenty-one months after he was indicted. *Id.* at *2. On appeal, two evidentiary aspects of the trial—a gun and Miles's nicknames—are at issue. Regarding the gun, the prosecutor told the jury in his opening statement that, during a search of Miles's apartment, the police "found a gun under [his] mattress, which . . . was not the same gun used in the murder, but [Miles] did, in fact, have a gun." Moreover, during trial, the prosecutor repeatedly referenced this gun, but also reiterated that it was not connected to the nightclub shooting. For example, when the police officer in charge of the investigation testified, the following exchange occurred:

> Q. Well, let's talk about that hand gun real quick. Was that hand gun sent off for testing?
>
> A. Yes, it was.
>
> Q. And did it match the bullets?
>
> A. No, it did not.
>
> . . .
>
> Q. That is not the gun that was used to shoot Michael Teasley?
>
> A. No, it was not.

Defense counsel also emphasized that the gun was not used in the murder. During his cross examination of the officer-in-charge, he asked "[D]oes that gun have anything, anything to do with this case?" The officer responded, "It doesn't now, no." And during his closing argument, defense counsel reiterated that the gun was "[c]ompletely unrelated to the case." Although defense counsel did not object to the prosecutor's references to the gun, he successfully opposed a motion to admit a picture of the gun into evidence.

With respect to the nicknames, the prosecutor's closing argument repeatedly referenced Miles's two nicknames, "Cat Daddy" and "Old Gangsta," which he had elicited from a defense witness during cross-examination.[1] Defense counsel did not object to the prosecutor's use of the nicknames. All told, the prosecutor used "Cat Daddy" six times and "Old Gangsta" four times. The prosecutor used both nicknames when arguing that Miles had killed Teasley because Teasley had "disrespected" him by throwing him out of "his" club:

- "They're not going to kick him out. This is his club. This is Cat Daddy, Old Gangsta. . . . He's angry."
- "That night, he was embarrassed in front of a lot of people on his turf. Okay. What's his state of mind? He's known as Cat Daddy there. He's known by Old Gangsta."
- "[This case is] about Mike Teasley. He's a loving father, husband, and son. And he was killed because Cat Daddy got his feelings hurt."

He also used both nicknames to downplay the significance of the hat's negative DNA test:

- "He wants to make a big deal about that hat. Saying we want to distance ourselves from the hat. I would, if I thought the hat played any role at all. . . . It's covered in leaves. It's covered in crusty old dirt. Do you think the Old Gangsta Cat Daddy's going to be wearing this thing to the club?"

Finally, the prosecutor used both nicknames to generically refer to Miles:

- "What do you know about Cat Daddy? You know he's 5, 10. You know he's got a lean build."

---

[1]The prosecutor mischaracterized part of the witness's testimony. The witness actually testified that Miles's nickname was "O.G." and that these initials stand for "Original Gangster," not "Old Gangsta."

- "The evidence points to the man with the black on, the man that had the motive, the man that fits the identification to a tee. Points to Cat Daddy. It points to the Old Gangsta. Who done it? He's sitting right there."

After a two-and-a-half-day trial, the jury convicted Miles of all charges. *Id.* Miles appealed to the Kentucky Supreme Court, arguing, among other things, that the 21-month delay between his indictment and trial violated his Sixth Amendment right to a speedy trial. Applying the four-factor test established in *Barker v. Wingo*, 407 U.S. 514 (1972), the Kentucky Supreme Court "adjudge[d] that Miles was not denied his right to a speedy trial in this case," and affirmed his convictions. *Miles*, 2009 WL 160435, at \*3, \*7.[2]

Miles then sought relief in collateral proceedings. In a habeas corpus petition filed in Kentucky state court, Miles argued that his trial counsel was ineffective for failing to object to the prosecutor's references to the gun found at his apartment and to the prosecutor's use of his nicknames. After an evidentiary hearing, the trial court denied his petition. The Kentucky Court of Appeals reversed, concluding that these failures—collectively and in conjunction with other errors—constituted ineffective assistance of counsel. *Miles v. Commonwealth*, No. 2012-CA-001240-MR, 2014 WL 4177446 (Ky. Ct. App. Aug. 22, 2014). The Kentucky Supreme Court granted discretionary review and reversed the Kentucky Court of Appeals, concluding that there was not a reasonable probability that the verdicts would have been different if his counsel had objected to the gun or nickname references. *Commonwealth v. Miles*, Nos. 2014-SC-000580-DG & 2015-SC-000321-DG, 2017 WL 5504212, at \*3–5 (Ky. Mar. 23, 2017). After exhausting state-court remedies, Miles unsuccessfully petitioned the District Court for the Western District of Kentucky for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## II.

"This Court reviews de novo the legal conclusions involved in the district court's decision to deny the writ under § 2254, and reviews for clear error its findings of fact." *Reiner v. Woods*, 955 F.3d 549, 554 (6th Cir. 2020) (citation omitted). Under the Antiterrorism and

---

[2]The Warden moved for us to take judicial notice of an unsuccessful motion to supplement the record that Miles filed with the Kentucky Supreme Court on direct appeal. In view of our disposition of this appeal, we dismiss this motion as moot.

Effective Death Penalty Act of 1996 ("AEDPA"), we can overturn a state conviction for an issue adjudicated on the merits only if the relevant state-court decision was (1) "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States;" (2) "an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States;" or (3) "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

To prevail under the "contrary to" clause, Miles must show that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or that it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite" to that reached by the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). To prevail under the "unreasonable application" clause, Miles must show that "the state court identifie[d] the correct governing legal principle from th[e] Court's decisions but unreasonably applie[d] that principle to the facts of [his] case." *Id.* at 413. To prevail under the "unreasonable determination of the facts" clause, Miles must show an unreasonable determination of fact and "that the state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Under AEDPA, "unreasonable" is not equivalent to "incorrect." *See Renico v. Lett*, 559 U.S. 766, 773 (2010). Indeed, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). And, "the more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico*, 559 U.S. at 776 (brackets and internal quotation marks omitted). In short, AEDPA imposes a "highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt." *Id.* at 773 (quotations omitted).

In this appeal, Miles raises three issues adjudicated on the merits by the Kentucky Supreme Court: (1) whether his Sixth Amendment right to a speedy trial was violated by the 21-month delay between his indictment and trial; (2) whether his trial counsel was ineffective for

failing to object to the prosecution's reference to the gun; and (3) whether his trial counsel was ineffective for failing to object to the prosecution's use of his nicknames.[3]  We address each in turn.

### III.

First, Miles argues that the Kentucky Supreme Court's adjudication of his speedy-trial claim was contrary to, and an unreasonable application of, the Supreme Court's holdings in *Barker* and *Doggett v. United States*, 505 U.S. 647 (1992).  We disagree.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]"  U.S. Const. amend. VI.  The speedy-trial right is "amorphous," "slippery," and "necessarily relative," so any claimed violation must be evaluated on an "*ad hoc* basis."  *Barker*, 407 U.S. at 522, 530.  In *Barker*, the Supreme Court established four factors for courts to consider when evaluating a speedy-trial claim: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice to the defendant resulted.  407 U.S. at 530.  "No one factor is dispositive.  Rather, they are related factors that must be considered together with any other relevant circumstances."  *United States v. Sutton*, 862 F.3d 547, 559 (6th Cir. 2017) (citing *Barker*, 407 U.S. at 533).

The first factor is a "threshold" requirement.  *Doggett*, 505 U.S. at 652.  The rationale here is that judicial examination of a speedy trial claim is needed only where the delay crosses the line dividing the "ordinary" from the "presumptively prejudicial."  *Id.* at 651–52.  The Supreme Court has never clearly drawn that line, but has noted that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial'" once the delay "approaches one year."  *Id.* at 652 n.1, 658.  Although "presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of the delay."  *Id.* at 656 (internal citation omitted).

---

[3]The district court also granted a certificate of appealability on a fourth issue: whether Miles's counsel was ineffective for failing to object to certain hearsay testimony.  Miles, however, waived this claim on appeal.

The second *Barker* factor looks at "whether the government or the criminal defendant is more to blame for th[e] delay." *Id.* at 651. "Governmental delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government, while neutral reasons such as negligence are weighted less heavily, and valid reasons for a delay weigh in favor of the government." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006) (citing *Barker*, 407 U.S. at 531). Thus, "different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531.

The third factor relates to "the defendant's responsibility to assert his right," and its effect will depend on the other factors. *Id*. "The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain." *Id*.

The fourth and final *Barker* factor is actual prejudice to the accused. "Prejudice 'should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect,' of which there are three: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *United States v. Ferreira*, 665 F.3d 701, 706 (6th Cir. 2011) (quoting *Barker*, 407 U.S. at 532).

Although the Kentucky Supreme Court correctly identified the four *Barker* factors, Miles takes issue with its analysis of the second and fourth factors.[4] We agree with the district court that Miles cannot overcome AEDPA deference.

---

[4]Miles also faults the state court for not "stating whether, and to what degree, each of the factors weigh in favor or against a conclusion that the Commonwealth violated [his] speedy-trial right." But as the Warden correctly notes, the United States Supreme Court has never required courts to so precisely define the weighing of the *Barker* factors. Thus, he cannot show that the Kentucky Supreme Court's failure to do so was contrary to, or an unreasonable application of, law established in the holdings of the Supreme Court. 28 U.S.C. § 2254(d).

A.

The Kentucky Supreme Court addressed the second *Barker* factor as follows:

>        As for reason for the delay, the Commonwealth argued that the toboggan hat was vital evidence in the case and that they could not go forward with the trial without the DNA testing being completed. Nevertheless, after the testing came back negative, the Commonwealth still proceeded with the trial and obtained a conviction against Miles. In fact, at trial the prosecutor elicited testimony from the lead investigator on the case, Detective Chris Ashby, that the hat had no relevance in the case and argued such in his closing argument. Miles asserts that this demonstrates that the testing on the hat was not a legitimate reason for the delay in this case and that the prosecutor intentionally misled the court as to the importance of the hat to the case.

>        The black toboggan hat in question was found and collected by the police as potential evidence at the scene. Officer Hill and two other witnesses testified at trial that the man who shot Teasley was wearing a toboggan hat. Simply because the testing came back negative on the hat and the prosecution subsequently argued at trial that the hat was not significant to the case, does not mean that the Commonwealth acted in bad faith in seeking DNA testing on the hat. After the hat tested negative for Miles' DNA, the Commonwealth had no choice but to minimize the evidentiary value of the hat at trial. In reviewing the record, there is no indication that the Commonwealth acted in bad faith. At the pre-trial hearings wherein the status of the testing on the hat was discussed, the prosecutor reported that he was regularly calling the lab to inquire about the status of the testing. Defense counsel admitted that the hat was crucial evidence and stated no objection to having the hat tested, although he sought to have their own expert present for testing.

*Miles*, 2009 WL 160435, at \*2–3. Miles takes issue with this analysis, arguing that it failed to answer "the relevant legal question": "whether the government or the criminal defendant is more to blame for th[e] delay." In his view, the Kentucky Supreme Court reduced this factor to an inquiry of whether the government acted in bad faith and failed to consider whether the government exercised "reasonable diligence" in waiting to test the hat and allowing the hat to languish at the lab.

The state court's treatment of this issue was not contrary to, or an unreasonable application of, a clearly established holding of the Supreme Court. Despite Miles's attempt to challenge the framing of this issue, state courts are not required to use specific language in addressing the *Barker* factors. *See Barker*, 407 U.S. at 530 ("[S]ome might express [the *Barker*

factors] in different ways.") And the Kentucky Supreme Court clearly did not limit its analysis to just a bad-faith inquiry[5] or ignore the question of who bore responsibility for the delay. It noted that "[d]efense counsel admitted that the hat was crucial evidence." *Miles*, 2009 WL 160435, at *3. Given the representations from both sides that the hat could be decisive either way, the court could have reasonably concluded that there was a valid reason for the delay. *See Barker*, 407 U.S. at 531 (providing the example of a "missing witness" as a valid reason for delay). Such a reason weighs in favor of the government and "justif[ies] appropriate delay." *Id*.

The Kentucky Supreme Court also noted that Miles's counsel did not initially object to the testing (even though the testing process started months after indictment), and the prosecutor was regularly calling the lab to inquire about the status of the results. This recognition supports the reasonable conclusions that testing was at first agreeable to both sides; that the government was diligent once the hat was sent to the lab, *see Doggett*, 505 U.S. at 656; and that the resulting delay was appropriate, *Barker*, 407 U.S. at 531.

In sum, the Kentucky Supreme Court's decision is not contrary to, or an unreasonable application of, *Barker*'s second factor.

B.

The Kentucky Supreme Court provided the following analysis of the fourth *Barker* factor:

> As for prejudice to Miles as a result of the delay, Miles alleges that he lost a key witness for trial, Steven Edwards, who died on June 25, 2006 in a motorcycle accident. Upon review of the record, the only references to Edwards were in a March 2007 motion to dismiss indictment for speedy trial violation and as an alias for Miles. According to the record, no subpoenas were issued for Edwards' appearance at either of the two trial dates prior to Edwards' death. Further, Miles does not allege what Edwards' testimony would have been and why he was so crucial to his case.

---

[5]We note, moreover, that the only argument Miles presented to the Kentucky Supreme Court was that the prosecution had acted in bad faith by sending the hat for testing. He made no argument, as he does now, related to prosecutorial negligence. As such, the Kentucky Supreme Court was not treating a lack of bad faith as dispositive; it was responding to Miles's only argument on this issue.

> Finally, although Miles was convicted, the negative test results on the hat were favorable to Miles' case at trial. The negative DNA results on the hat were a large part of Miles' defense and were repeatedly referred to by defense counsel at trial as proof that Miles was not the shooter.

*Miles,* 2009 WL 160435, at \*3. Miles argues that the state court erred by requiring him to show "affirmative proof of particularized prejudice" when he had established presumptive prejudice under the first *Barker* factor. Miles also contends that the court failed to consider this presumptive prejudice in its *Barker* analysis and failed to account for the other forms of prejudice that Miles suffered—oppressive pretrial incarceration and anxiety and concern.

Miles's arguments are meritless. Finding actual prejudice based on length of delay alone is the exception, not the rule. *See Doggett*, 505 U.S. at 655; *see also Robinson*, 455 F.3d at 608 ("In the absence of particularized trial prejudice, delay attributable to the government's negligence has typically been shockingly long to warrant a finding of prejudice." (internal quotation marks omitted)). And when the government acted with reasonable diligence or the delay was for a valid reason, a speedy-trial claim fails "no matter how great the ensuing delay." *Robinson*, 455 F.3d at 608 (citation omitted); *see Doggett*, 505 U.S. at 656. Even if the government acted negligently, we have declined to conclude that presumptive prejudice resulting from delays similar to that experienced by Miles justified an inference of actual prejudice. *See United States v. Jackson*, 473 F.3d 660, 667–68 (6th Cir. 2007) (collecting cases and holding that a nearly two-year delay between a defendant's indictment and his arrest, attributable to the government's negligence, did not satisfy the actual prejudice factor of *Barker*); *see also Barker*, 407 U.S. at 533–34 (finding that "prejudice was minimal" despite delay "well over five years").

Nor can we conclude that the state court failed to consider presumptive prejudice in its weighing of the *Barker* factors. Applying the first *Barker* factor, the Kentucky Supreme Court concluded that the 21-month delay in this case was "presumptively prejudicial." *Miles*, 2009 WL 160435, at \*2. The court then held that "[u]pon consideration of all of the above factors in *Barker*, we adjudge that Miles was not denied his right to a speedy trial." *Id*. at \*3. We take the Kentucky Supreme Court at its word and conclude that the state court considered presumptive prejudice in its *Barker* decision.

Finally, Miles's other prejudice concerns are not sufficient to invalidate the state court's conclusion. For one, AEDPA requires "deference to be given even in cases, such as this one, where the state court's reasoning is . . . abbreviated." *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009); *see Johnson v. Williams*, 568 U.S. 289, 300 (2013). That the state court did not expressly weigh the two less "serious" forms of actual prejudice, *Barker*, 407 U.S. at 532, does not mean that it "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law," *Williams*, 529 U.S. at 405. Indeed, to receive AEDPA deference, a state court does not even have to "explicitly address the factors outlined in *Barker*" at all, "as long as the court does not apply a test or standard that is contrary to federal law." *Brown v. Bobby*, 656 F.3d 325, 330 (6th Cir. 2011). In any event, Miles was already incarcerated on other state charges while he awaited trial on his murder charges. We have held that being "ineligible for certain placements and programs in the state prison" because of the charges underlying a speedy-trial claim is "not the type of prejudice cognizable under the Sixth Amendment." *Robinson*, 455 F.3d at 609. And Miles did not provide any indication to the Kentucky Supreme Court that his anxiety was "beyond that which is inevitable in a criminal case." *Hakeem v. Beyer*, 990 F.2d 750, 762 (3d Cir. 1993) (internal quotation marks omitted); *see Smith v. Commonwealth*, 361 S.W.3d 908, 918 (Ky. 2012); *Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998).

For these reasons, the Kentucky Supreme Court's decision was not contrary to, or an unreasonable application of, *Barker*'s fourth factor.

## C.

*Barker*'s "balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis." 407 U.S. at 530. Given the *Barker* inquiry's generality, *see Sutton*, 862 F.3d at 559, we cannot conclude that the Kentucky Supreme Court's decision "was so lacking in justification" as to require habeas relief. *Harrington*, 562 U.S. at 103. We therefore reject Miles's speedy-trial claim.

IV.

Next, Miles asserts that his trial counsel was ineffective by failing to object to the prosecutor's references to the gun found in his apartment and to the prosecutor's references to his nicknames in closing. AEDPA, coupled with the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the proper framework for assessing these claims. Under *Strickland*, Miles must show that his counsel provided "deficient" performance that "prejudiced the defense." *Id.* at 687. Prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, and a reasonable probability is a "substantial, not just conceivable, likelihood of a different result," *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (internal quotation marks omitted). This standard is "highly demanding," *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986), and when, as here, an ineffective-assistance-of-counsel claim is subject to AEDPA's constraints, our review is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The Kentucky Supreme Court identified and applied *Strickland*, so the question is whether its decision involved an "unreasonable application of" *Strickland* or was based on an unreasonable determination of the facts. To meet that standard, Miles must show far more than that the state court's decision was "merely wrong" or "even clear error." *Virginia v. LeBlanc*, 137 S.Ct. 1726, 1728 (2017) (per curiam) (internal quotation marks omitted). He must show that the state court's decision is so obviously wrong that its error lies "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Congress "meant" this standard to be "difficult to meet." *Id.* at 102. And Miles has not satisfied that standard here.

A.

Miles argues that the Kentucky Supreme Court committed two legal errors in considering the prejudice prong of his ineffective-assistance claim based on failure to object to the gun. First, he contends that the court "set[] the bar higher" by applying a harmless-error standard under its decision in *Harris v. Commonwealth*, 384 S.W.3d 117 (Ky. 2012), rather than *Strickland*. This argument misreads the Kentucky Supreme Court's opinion. The court cited *Harris* only for the proposition that "[t]he Court of Appeals correctly noted that weapons

unrelated to the crimes charged are generally inadmissible." *Miles*, 2017 WL 5504212, at \*4. And that is all that the cited portion of *Harris* stands for. *See Harris*, 384 S.W.3d at 123–24 (collecting cases where weapons with no connection to the crime were held to be inadmissible). Although *Harris* confronted the issue of an unrelated gun in the context of harmless-error review, the Kentucky Supreme Court clearly applied *Strickland*'s prejudice standard in Miles's case. *Miles*, 2017 WL 5504212, at \*2–5.

Miles also faults the state court for failing to undertake a "probing and fact-specific" prejudice inquiry. *See Sears v. Upton*, 561 U.S. 945, 955 (2010) (per curiam). But it noted that the officer-in-charge had admitted that the gun was not connected to Teasley's murder, that the jury was repeatedly informed that the gun was unrelated to the murder, and that the gun itself was not admitted into evidence. To be sure, the Kentucky trial court could have done more to ensure that the gun did not factor into the jury's decision, such as giving a specific curative instruction. But the Kentucky Supreme Court clearly understood the facts of Miles's case and reasonably concluded that he had not met *Strickland*'s prejudice prong. This is all that is required to satisfy AEDPA deference on this issue, so we reject this ineffective-assistance claim.

B.

Finally, Miles alleges two points of error regarding the use of his nicknames. First, he contends the Kentucky Supreme Court miscounted the number of times the prosecutor referred to his nicknames, which means its no-prejudice conclusion was based on an unreasonable determination of fact. In arguing the nickname issue before the Kentucky Supreme Court, Miles relied on *United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009), where the Second Circuit held that the district court should not have allowed the Government to repeatedly reference the defendant's nickname when "identity was not an issue," the nickname "had no legitimate relationship to the crimes charged," and it was "suggestive of a criminal disposition." *Id*. at 146 (internal quotation marks omitted). The Kentucky Supreme Court distinguished *Farmer* from this case as follows:

> Miles and the Court of Appeals cite cases that found the use of an alias created so much prejudice that it created an unfair trial. For instance, *United States v. Farmer*, in which the Second Circuit Court of Appeals found the use of

the defendant's nickname "Murder" was overly prejudicial. In *Farmer*, the court stated, "In our prior cases, the government's use of a defendant's nickname was 'occasional' or 'brief and isolated." But *Farmer*'s nickname was the main rhetorical trope used by the prosecution to address the jury and was used no fewer than thirty times."

Miles's facts are distinct from those in *Farmer*. Miles's nickname was used a total of three times after it was first mentioned in the testimony of a defense witness. The present case is a far cry from the "rhetorical trope" in *Farmer*.

*Miles*, 2017 WL 5504212, at *3 (footnotes, brackets, and ellipses omitted). Miles is correct that the court miscounted the instances where the prosecutor used his nicknames—the prosecutor used the name "Old Gangsta" four times, not three.[6] Nonetheless it is immaterial.

Despite the state court's miscalculation, Miles has not shown that its prejudice finding was *based on* there being only three uses of "Old Gangsta," or that its conclusion would have been different had it properly considered the additional use. Even with four uses, the prosecutor's conduct remained a "far cry . . . from *Farmer*." *Id*. There, the prosecution used the nickname "no fewer than thirty times during the rebuttal summation in a presentation that occupies only sixteen transcript pages." *Farmer*, 583 F.3d at 147. In contrast, the prosecutor here used "Old Gangsta" four times in a summation spanning eighteen transcript pages. As the Kentucky Supreme Court recognized, this case is closer to instances where the prosecutor's misuse of a nickname was "occasional" or "brief and isolated" than it is to instances were a nickname became a "rhetorical trope." *Id*. (citations omitted). Thus, the Kentucky Supreme Court's prejudice decision was not based on an unreasonable determination of the facts in light of the record before it. *See Rice*, 660 F.3d at 250.

Second, Miles again contends that the state court failed to undertake a "probing and fact-specific" prejudice inquiry. *See Sears*, 561 U.S. at 955. We disagree. The court's opinion shows that it had reviewed the factual and procedural history of the case and concluded that the

---

[6]We focus on "Old Gangsta" because "Cat Daddy" is not suggestive of criminal disposition. *See Farmer*, 583 F.3d at 146. Although it is unclear why Miles was called "Cat Daddy," there is no indication that this nickname has a criminal connotation, which is presumably why defense counsel was comfortable using it in his opening statement. In addition, Miles never argued to the state courts that his counsel should have specifically objected to the prosecution's use of "Cat Daddy." Nor did he do so below.

nickname references "in the context of [the] entire trial, were de minimis," and that "[b]elieving the reference to Miles's nickname somehow would have changed the course of his verdict is speculative." *Miles*, 2017 WL 5504212, at \*3. This approach and conclusion are consistent with *Strickland*. Thus, the Kentucky Supreme Court's treatment of the nickname references survives AEDPA review, and Miles's ineffective-assistance-of-counsel claim fails.[7]

V.

For these reasons, we affirm the district court's judgment and deny the pending motions.

---

[7]After Miles filed his appeal, prison officials transferred him from a prison located in the Western District of Kentucky to a prison located in the Eastern District of Kentucky. We previously concluded that this transfer "clearly violated" Federal Rule of Appellate Procedure 23(a) because the Warden did not obtain the district court's permission before initiating the transfer. We deny petitioner's motion for a transfer without prejudice to its refiling in the district court.