NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0399n.06

No. 20-1059

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SAMUEL LEE DANTZLER,

       Petitioner-Appellant,

v.

RANDEE REWERTS, Warden,

       Respondent-Appellee.

)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 25, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:    MOORE, ROGERS, and READLER, Circuit Judges.

ROGERS, Circuit Judge.

In January 2006, Bernard Hill was murdered in his girlfriend's apartment when a group of men broke into the apartment and attacked him. Left behind in the apartment was a black knit cap worn by one of the perpetrators. The case went cold until the Detroit Police Department obtained a grant allowing them to test DNA in the cap more than three years later. That DNA evidence led officers to Samuel Dantzler, whom they arrested in connection with the murder. Dantzler's trial counsel understood that the DNA evidence would be crucial and sought to retain an independent DNA expert. The trial court appointed an expert but later decided her fee schedule was exorbitant and did not approve her compensation. When Dantzler's case eventually went to trial, Dantzler's defense counsel had not found another expert to advise on proper cross-examination of the prosecution's DNA experts or to rebut their testimony. Dantzler was ultimately convicted of first-degree felony murder. He appealed his conviction and later sought postconviction relief in the

Michigan courts, to no avail. Dantzler petitioned for habeas relief in federal court, which the district court denied. There are three issues on this appeal: (1) whether the Michigan trial court violated Dantzler's due process rights when it denied funding for a DNA expert; (2) whether Dantzler's trial counsel was ineffective for not securing a DNA expert to assist with Dantzler's defense; and (3) whether appellate counsel was ineffective for not raising a claim that trial counsel was ineffective. Because the Michigan Court of Appeals' conclusion that the trial court did not deny Dantzler funding for an expert witness is not an unreasonable application of clearly established law or an unreasonable determination of the facts, the district court properly dismissed the due process claim. Dantzler's ineffective-assistance-of-counsel claims also fail because Dantzler does not articulate how the lack of an independent DNA expert prejudiced him, and he is therefore not entitled to habeas relief.

## I. The Murder and Investigation

In the early hours of January 16, 2006, Bernard Hill was shot and killed in his apartment. Just a few hours earlier, Hill had assaulted Quiana Turner, his ex-girlfriend and the mother of his daughter. News of the assault spread to Turner's family members, including Samuel Dantzler, who is Turner's uncle. After Hill attacked Turner, he went to the apartment of his girlfriend at the time, Nikitta McKenzie. At around 12:45 AM, a group of about six men dressed in all black broke down the door of McKenzie's apartment. One of the men held a gun to McKenzie's face, demanding to know whether Hill was in the apartment. Hill entered the room, and as the men began to fight, McKenzie ran into the bathroom with her cell phone and stood quietly. While she was in the bathroom, one of the attackers shot Hill in the head, killing him. Left behind at the scene of the murder was a black skull cap worn by one of the perpetrators. The police were unable to identify the assailants, however, and the case went cold.

Years later, in September 2009, the Detroit Police Department received a grant that allowed the Department to test the cap for residual DNA. The test results matched Dantzler's DNA profile, and he and his son were tried on the theory that they were part of a "posse" that attacked Hill in retaliation for assaulting Turner. Dantzler's son, Samuel Lamare Dantzler (who eventually pleaded guilty), admitted that he had pointed the attackers to Hill's location, knowing that they had golf clubs and were planning to beat Hill up, although he did not testify at his father's trial.

## II. Pre-Trial Proceedings and the Murder Trial

In the months before the trial, Dantzler's counsel, Robert Kinney, sought approval for an independent DNA expert. In July 2010, the trial court approved the request and ordered that the expert make the results available at least ten days before trial, which was scheduled for that October. As the trial date neared, the prosecution still had not turned over the DNA evidence, complicating Kinney's efforts to secure an independent expert. The trial court judge indicated that if the government did not turn over its report to the defense by August 20, he would consider suppressing that evidence. At a pretrial hearing on September 9—approximately one month before the scheduled trial date—Dantzler's counsel still had not received the government's DNA report, likely due to an "overwhelming" backlog. Kinney had contacted the Specklin lab to obtain an expert, but the lab wanted to review the prosecutor's report before committing to assisting Dantzler. Based on discussions of the lab's timeline, it became clear that it was unlikely that the government's report would be completed early enough to give the defense's DNA expert enough time to review it. Although the trial court expressed its reluctance to postpone trial, the court ultimately agreed to move trial to December once Dantzler's counsel made clear that "[w]e need our expert" and Dantzler had waived any speedy trial claims.

On November 24, the trial court entered another order, this time specifically naming Ann Chamberlain as Dantzler's independent DNA expert. The order specified that Chamberlain would be compensated according to her fee schedule. But shortly before trial, an issue arose with Chamberlain's requested fees. Chamberlain demanded a $1,500 retainer fee, a $250 hourly rate, and $2,500 for each day of depositions or court testimony. The judge found the retainer to be excessive and denied funding for it.

Before the trial began in December, Kinney recounted his attempts to secure an independent DNA expert. Making no mention of the Specklin lab he had previously contacted, Kinney informed the court that he had attempted to secure Cathy Carr as an expert but that she had a conflict because she had worked with the prosecution on Dantzler's case. On Carr's recommendation, Kinney then reached out to Chamberlain, the expert who was appointed by the trial court just the month before. In a discussion about Chamberlain's rates, the court noted that it had been willing to approve the hourly rate but found her $2,500 daily fee for depositions or testimony to be "extraordinary" and the retainer to be "exorbitant." The judge explained that he had also consulted with the court's chief judge, who agreed that the requested fees were extraordinarily high. Defense counsel said he "wanted to put that on the [r]ecord because Ms. Chamberlain—well, she wants the retainer or she won't be here." Kinney asserted at one point that his client "is just making sure that Ms. Chamberlain was ready to do her own test, to determine whether his DNA was on the cap." The judge said he did not "preclude" Chamberlain as a witness, to which Kinney responded, "[S]he was supposed to be an expert, she never brought any results, never indicated to our office that she did anything." This discussion between the trial court and defense counsel often veered into other issues, and it was finally cut off when the court called in the jury.

The trial lasted approximately four days. The prosecution called Deputy Chief Medical Examiner Cheryl Loewe. Although Dr. Loewe did not perform Hill's autopsy herself, she had reviewed the autopsy report and testified that Hill's death was the result of "the presence of a single gunshot entrance wound to the back of his head." Loewe also testified that Hill endured blunt force injuries and that there was evidence of a struggle or defensive wounds. The prosecution then called William Niarhos, an evidence technician with the Detroit police, who was responsible for documenting the scene in Hill's apartment. Niarhos said he found the black skull cap on the floor of the apartment, next to a broken television. He testified that the door to Hill's apartment had been forced inward. There was broken furniture, including a dining room table and chairs, in certain areas of the apartment and a trail of blood from the front door to Hill's body.

Janet Burt, Hill's mother, also testified. Burt stated that hours after Hill had attacked Quiana Turner, early in the morning, Samuel Dantzler's son and Turner's brother Rodney banged on the door of her house. Burt did not answer the door, but she saw through the door's peephole the younger Dantzler and Rodney walk to a "gold, long car" outside her home. When they opened the door, Burt could see other individuals in the car but could not identify them. Burt initially stated that she recognized the car to be Dantzler's, but later admitted during cross-examination that it had been months since she had seen Dantzler driving the gold car. Burt also testified about another "strange" incident that day. She said that that she was watching her granddaughter— Turner and Hill's daughter—who was supposed to spend the weekend with her. But that evening, Turner's mother and cousin stopped by to pick up Burt's granddaughter. Shortly after Turner's relatives left, Burt got a call from Hill's girlfriend, McKenzie, who was screaming that Hill had been murdered.

The prosecution also called Nikitta McKenzie, Bernard Hill's former girlfriend, who recounted the events on January 15 and 16. She testified that she had learned from Hill that something had happened between Hill and Turner, that Hill was at her apartment, and that he was acting pretty nervously. At around 12:45 A.M., the door to her apartment was "kicked in." According to McKenzie, a group of about six Black men, one of whom was wearing a black cap, entered McKenzie's apartment, with at least one of the men carrying a golf club. One man held a gun to McKenzie's face and asked if Hill lived at that apartment. Hill appeared in the room, at which point a fight broke out and McKenzie ran out of the room. She heard a scream and gunshots. Because she was hiding in the bathroom and it was dark, she could not identify any of the intruders.

The government also relied on the testimony of three DNA experts. First, Christopher Steary, a forensic biologist for the Detroit Police Department, testified that he did a "cursory examination" of the cap and cut a piece from the inside rim opposite the tag, where he could "expect the person to be wearing [it at] the front of the head." Steary also collected DNA from Hill and another suspect, and sent everything to Bode Technology, an outside vendor laboratory.[1]

At a point after Steary had testified, Dantzler was permitted to raise the issue of an independent expert to the court. Dantzler expressed his frustration and dismay at the fact that he had been requesting a DNA expert since he was first "locked up" and that the cap had still not been independently tested. The court responded that it had appointed an expert and "tried to assist the defense wherever possible" but explained that it would not "get involved in [defense counsel's] trial strategy" and would "defer to Mr. Kinney." The court indicated it would "deal with the issue again . . . at an appropriate time" because the issue was not immediately relevant at that point.

---

[1] During his direct examination of Steary, the prosecutor removed the cap from its bag and touched it. As a result, Steary explained, no more DNA testing could be conducted.

The prosecution proceeded to call its other DNA expert witnesses. Rebecca Preston, a DNA analyst from Bode Technology, explained her examination of the DNA from Steary's cuttings of the inner rim of the cap and from three additional cuttings she had made. The Steary cutting contained a mixture of two people's DNA and included a major male contributor. Preston testified that the DNA contained in the Steary cutting was consistent with Dantzler's and that the "probability of randomly selecting an unrelated individual with this DNA profile at 13 of the 13 blocks [she] tested is one in 90 quadrillion in the U.S. Caucasian population, one in two quadrillion in the U.S. African American population, and one in 20 quadrillion in the U.S. Hispanic population." (During his opening and closing statements and throughout the trial, the prosecutor mistakenly repeated the one-in-two-quadrillion statistic as "one in 2.3 quadrillion.") The DNA evidence from the additional three cuts was inconclusive with respect to whether it was Dantzler's.

The government's third DNA expert, Nicole Kaye, who was also an analyst for Bode, testified that she extracted DNA from the initial cutting of the cap and found that alleles from Bernard Hill's sample matched the DNA profile in the cap. She also testified that Patrick Grunewald, another suspect, could be excluded as a contributor

After the prosecution's case-in-chief, the defense called Marie Simpson, Dantzler's friend and the mother of his daughter. She testified that on the night of the murder, she had picked Dantzler up after work, and he went home with her as part of an agreement to watch their daughter. According to Simpson, Dantzler spent the night in the same room as their daughter and was still at the house at the next morning. Simpson denied ever seeing Dantzler driving a gold-colored car (like the one Burt spotted outside her home) and also asserted she had never seen Dantzler wear a black cap like the one found at the scene of the murder. On cross-examination, Simpson had difficulty explaining why she never reported to the police the fact that Dantzler stayed with her on

the night of the murder. At one point during cross-examination, she testified that she had informed the investigator who arrested Dantzler that Dantzler had been with her. When pressed as to why she never went down to the police station to give a statement to that effect, she said she didn't think to and had "stayed in the background" during this period. During the prosecution's rebuttal, the investigator testified that although he "had a conversation with [Simpson]" and told her that Dantzler was being arrested for a homicide, he did not discuss the details of the homicide, and Simpson never said to him that Dantzler could not have committed the crime because he was with her.

Dantzler testified and denied that he was involved with the murder, claiming he did not even know that Hill was killed until two days after the fact. He admitted that he knew that Hill had attacked Turner and was aware of the previous assaults but testified that he had never confronted Hill about those attacks. Dantzler's defense counsel asked Dantzler whether he had owned a "long, gold-colored Chrysler" like the gold car Burt had seen outside her house. Dantzler said, "Yes, I did," and then explained that he sold this car to his brother-in-law approximately a year before Hill's murder. But on cross-examination, Dantzler denied ever having a gold car and said he had admitted owning an *old*, not gold, car. Dantzler also admitted the possibility that he had previously worn a black skull cap like the one found in Hill's apartment. When the prosecution asked Dantzler how his DNA could have ended up inside the hat, Dantzler theorized that "either it was put there or [he] had worn that hat before." Defense counsel did not present any expert testimony.

Dantzler was convicted of first-degree felony murder and was sentenced to life imprisonment without the possibility of parole.

### III.  The Appeal

Dantzler appealed his conviction and was appointed counsel.  His appellate counsel, Neil Leithauser, raised three challenges.[2]  The only one directly relevant to this appeal was the claim that the "trial court's denial of necessary funds for an independent expert to review the DNA evidence denied Mr. Dantzler due process guarantees under the Fourteenth Amendment and [the Michigan Constitution]."  Leithauser did not assert a claim that trial counsel was ineffective.  The Michigan Court of Appeals rejected each of Dantzler's claims and affirmed the conviction.  *People v. Dantzler*, No. 303252, 2012 WL 2335913 (Mich. Ct. App. June 19, 2012) (per curiam).  The court found that the trial court had agreed to pay for an expert on defendant's behalf, thus satisfying the state's obligations.  *Id.* at *4.  It concluded that "[d]efendant's unilateral decision not to take advantage of the opportunity did not amount to a violation of his right to equal protection.  And the trial court did not abuse its discretion in refusing to pay the expert's retainer fee."  *Id.*  The Michigan Supreme Court denied Dantzler's application for leave to appeal the Court of Appeals' Order.[3]

### IV.  State Postconviction Proceedings

Dantzler, acting pro se, filed a motion for relief from judgment seeking postconviction relief in Michigan under Mich. Comp. Laws Ann. § 6.500.  The motion raised numerous claims, including an ineffective-assistance-of-trial-counsel (IATC) claim based on trial counsel's failure to hire a DNA expert "after the funds were granted," among other things.  Dantzler also raised an

---

[2] Two challenges related to the trial court's "*sua sponte* modification to a requested adverse-inference instruction" and the sufficiency of the evidence presented at trial.  These are not directly related to this appeal.

[3] During the appeal, Dantzler had complained to the Michigan Appellate Assigned Counsel System (MAACS) administrator about Leithauser's representation.  The MAACS deputy administrator found one claim in particular to be meritorious:  that Leithauser's appellate brief was not timely, and, as a result, Leithauser did not preserve the right to oral argument.  Leithauser claimed he had decided to forgo oral argument to devote more time to developing the brief, but the deputy administrator explained that the "Minimum Standards do not provide for the choice [he] described."  The deputy administrator found that "Mr. Dantzler's rights went unprotected" and concluded that the violation was "serious and of concern."

ineffective-assistance-of-appellate-counsel (IAAC) claim, based in part on appellate counsel's failure to recognize that the trial court had not denied funds for an independent DNA expert and by making an unsupported argument that the trial court had denied such funding. As described below in more detail, the Michigan court denied Dantzler's motion for post-conviction relief. Dantzler petitioned both the Michigan Court of Appeals and the Michigan Supreme Court for review, and was denied by form orders stating that Dantzler failed to meet the requirements of Michigan Court Rule 6.508(D).

## V. Federal Habeas Claim

Dantzler filed for habeas relief in federal court, asserting numerous claims raised in his state motion for postconviction relief, including the ineffective-assistance-of-trial counsel and ineffective-assistance-of-appellate-counsel claims, a claim that the trial court's denial of funding for a DNA expert violated his due process rights, and a challenge to the sufficiency of the evidence.[4] The district court denied each claim but granted a certificate of appealability on both ineffective-assistance-of-counsel claims.

In rejecting a sufficiency-of-the-evidence argument (a claim not before us today), the district court reasoned:

> At the end of the trial, the jury was left to consider the physical and circumstantial evidence tying Dantzler to the crime. This included testimony that the general motive for the killing was retribution against Hill for beating Turner, and that the murder was therefore committed by people related to or associated with Turner. It included Burt's testimony that she saw Dantzler's car outside her residence. And it included Dantzler's DNA that was found on a hat left at the scene of the murder. The jury also heard testimony from Dantzler's alibi witness, as well as Dantzler himself. The jury made judgments about these witnesses' credibility to which the Michigan Court of Appeals could reasonably defer.

---

[4] Dantzler had initially filed his federal habeas petition before he moved for postconviction relief in Michigan, but he sought and was granted a stay to exhaust his state claims.

The district court rejected Dantzler's claim that the trial court erroneously denied Dantzler funds to retain an independent DNA expert in violation of his due process rights. It reviewed Dantzler's arguments based on *Ake v. Oklahoma*, in which the Supreme Court held that when an indigent defendant's mental state is seriously in question, he or she is entitled to "access to a competent psychiatrist who will conduct an appropriate examination" and assist in the defense. 470 U.S. 68, 83 (1985). Because the Supreme Court has "not extended *Ake*'s rule to non-psychiatric experts," the district court explained, "Dantzler's claim [was] not supported by clearly established Supreme Court law." The district court also found that, as a factual matter, the trial court had in fact granted Dantzler funds to retain an independent DNA expert.

The district court then analyzed Dantzler's claims that his trial and appellate counsel were ineffective. It acknowledged that the state court opinion was ambiguous as to whether it was denying Dantzler's IATC claim on procedural grounds or on the merits. Although the district court noted that citations to "the procedural bar [(MCR 6.508(D))] seems to suggest this was the rationale for the [state court's] opinion," the district court recognized that the state court addressed the merits of the IATC claim in its procedural-default ruling. Accordingly, the district court considered the IATC claim on the merits and applied deference under the Antiterrorism and Effective Death Penalty Act (AEDPA). It acknowledged "there is a chance that additional testing might have shown there was DNA on the hat belonging to one of the other suspects" or could have "revealed the DNA of one of the other suspects," which would have "supported Dantzler's assertion that he was not the person who brought the hat to the crime scene." But the court also reasoned that, "given that the results of additional DNA testing may not have been helpful to Dantzler," it may have been a "reasonable strategic decision" to "la[y] the groundwork for the jury to question whether someone other than Dantzler left the hat at the crime scene" by just "argu[ing]

to the jury the deficiencies with the testing done by the State's experts." Even if counsel was deficient, the district court went on, Dantzler could not establish prejudice because:

> The benefits an independent DNA expert could have provided are speculative. There is no suggestion that an independent expert would have refuted the findings of the state's expert. An independent expert could have attempted to do additional DNA testing on the hat to try to identify another suspect, but it is impossible to know whether additional samples could have been obtained. And even if the expert did obtain additional samples, there is no way to know who, if anyone, the samples would have identified. It is possible that additional samples could have been matched to another family member. But even if someone else's DNA was connected to the hat, that would not eliminate the fact that Dantzler's was as well. He would still be connected to the crime scene. Because the untested DNA creates such a high degree of speculation, prejudice cannot be established under *Strickland*.

The district court accordingly dismissed Dantzler's IATC claim. The district court also concluded that the state court's rejection of the IAAC claim (on the ground that appellate counsel had discretion to "winnow out weaker arguments") was a reasonable application of federal law because Dantzler's other postconviction claims failed.

The district court denied relief but granted a certificate of appealability limited to the IATC and IAAC claims. Dantzler, still pro se, moved for reconsideration, and he petitioned to expand the certificate of appealability and to be appointed counsel for his appeal. The district court denied the motions for reconsideration and to expand the certificate, but appointed counsel for this appeal. Counsel then filed a motion before this court to expand the certificate, which was granted in part to permit consideration of the claim that the trial court violated Dantzler's due process rights by failing to provide adequate funding for a DNA expert.

## VI. Due Process Claim

The Michigan Court of Appeals' conclusion that the trial court did not violate Dantzler's due process rights when it declined to fund the appointed DNA expert according to her fee schedule

was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; nor was it "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Because this claim was adjudicated on the merits as part of Dantzler's direct appeal and rejected by the Michigan Court of Appeals, it is subject to AEDPA deference. *See Thompson v. Skipper*, 981 F.3d 476, 479 (6th Cir. 2020). "AEDPA imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Miles v. Jordan*, 988 F.3d 916, 924 (6th Cir. 2021) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Dantzler cannot show that the Michigan court's finding that the trial court never denied Dantzler's request for an expert was an unreasonable determination of the facts. To prove a state court's decision was based on an unreasonable determination of the facts, a petitioner must demonstrate "that the state court's presumptively correct factual findings are rebutted by 'clear and convincing' evidence and do not have support in the record." *Pollini v. Robey*, 981 F.3d 486, 497 (6th Cir. 2020) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). The Court of Appeals concluded that because the trial court agreed to pay for an expert for Dantzler, "the state satisfied its obligation to provide [Dantzler] with the means to prepare his defense" and that Dantzler had failed to "take advantage of the opportunity." *Dantzler*, 2012 WL 2335913, at *4. The court explained that the requirement that the defendant be provided access to a competent expert does not mean that Dantzler was "entitled to an expert of his choosing" and found that Dantzler had failed to "establish that other experts were unavailable." *Id.* at *3. Such a conclusion is firmly supported by the record.

In July 2010, the trial court entered an order approving an independent DNA expert and later approved Chamberlain specifically. The court later indicated it was willing to honor the hourly rate but found either the $1,500 retainer fee or the $2,500 deposition or testimony fee to be exorbitant and denied Chamberlain's specific fee schedule.[5] The judge noted that neither he, nor the chief judge, with whom he had consulted, had seen requests for such fees. Dantzler does not explain what else the trial court should have done, short of approving Chamberlain's specific fee schedule. Dantzler indicates that counsel's discussion of Chamberlain's fee demands immediately before trial should have alerted the court that counsel had no strategic reason not to retain an expert and that he had simply been unable to do so because of the limited funds provided by the court. But trial counsel never claimed that he tried to secure other DNA experts and was unable to do so because of the compensation schedule. Dantzler does not argue that his attorney sought a continuance to find an expert and was denied. Given such a record, the Michigan court's finding that the trial court did not deny Dantzler funding for an expert is a far cry from an unreasonable determination of the facts.

Nor can Dantzler succeed on his argument that the Michigan Court of Appeals unreasonably applied federal law. As the Supreme Court has repeatedly reminded us, this standard "is difficult to meet," *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citation omitted), and Dantzler has not met it here.

Dantzler's primary argument is that the denial of a DNA expert violated his right to provide a meaningful defense, which he contends has long been established by federal law, as reflected in

---

[5] It is not entirely clear whether the trial court found the retainer or the deposition/testimony fee to be problematic. Initially, it appears the court was responding to trial counsel's discussion of Chamberlain's request for $2,500 a day. The court suggested that the testimony fee was what caused it to consult with the presiding judge, but in later discussions, the trial court's concerns appeared to center on the retainer fee. Dantzler contends that the Michigan Court of Appeals and the district court erroneously referred to $2,500 as a "retainer fee," and the warden agrees but suggests that the court was troubled by both the retainer fee and deposition fee.

*Ake v. Oklahoma*, 470 U.S. 68, 83 (1985), *Britt v. North Carolina*, 404 U.S. 226, 227 (1971), and *Griffin v. Illinois*, 351 U.S. 12, 17 (1956). The parties dispute how broadly *Ake* and its predecessor cases can be read: Dantzler contends that the court below read *Ake* too narrowly in concluding that it required only the appointment of a psychiatric expert. The warden counters that "under AEDPA, the district court was not permitted to expand the Supreme Court's holding" in *Ake* to find that the state is required to fund a DNA expert, and his brief is dedicated to arguing why that right is not clearly established by the Supreme Court. Lost in this dispute, however, is that the Michigan Court of Appeals, without citing *Ake*, *agreed* with Dantzler's argument that equal protection "requires that the state afford an indigent defendant an expert witness when the witness remains important to the defendant's preparation of a defense." *Dantzler*, 2012 WL 2335913, at *3. But, as noted above, that court found that the state had indeed provided Dantzler with the means to secure an expert witness, even if it was not his preferred expert, and thus there was no equal protection violation.

Dantzler does not grapple with this holding, and he does not appear to argue that the Michigan court's conclusion that equal protection does not require Dantzler to be afforded an expert of his choosing was contrary to clearly established federal law. Nor could he. *Ake*, the key case on which he relies, makes clear that a state need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy" and that an indigent defendant does not have "a constitutional right to choose a[n expert] of his personal liking or to receive funds to hire his own." *Ake*, 470 U.S. at 77 (citing *Ross v. Moffitt*, 417 U.S. 600 (1974)). Rather, the Court explained, the crucial feature of "fundamental fairness" is that it "entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system.'" *Id.* (quoting *Ross*, 417 U.S. at 612). Dantzler's suggestion that the district court's refusal to approve

Chamberlain's particular fee schedule given the prosecution's own expenditures amounts to the denial of a competent expert is belied by the record. Dantzler points to the court's "refus[al] to approve funding for a $1500 retainer" even as the prosecution "spen[t] upwards of $4,000" on its DNA testing. But Dantzler does not present evidence that the trial court had imposed a cap on the defense expert's compensation. Dantzler cannot meaningfully advance such an argument, as the record indicates that the trial court was troubled by the rate methodology, not necessarily the final cost that would be incurred. The trial court explained that it "had no problems with [Chamberlain's] hourly fee, and it may well have been that the hourly fee would have probably paralleled . . . what [Chamberlain] was entitled to had [her testimony] taken as long as the projection was." What the court did find troubling, however, was the possibility that Chamberlain could "testify for an hour and . . . bill for a full day." On this record, we are not convinced that the Michigan court unreasonably applied federal law. Accordingly, Dantzler is not entitled to habeas relief on his due process claim. To obtain habeas relief, "a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## VII. Ineffective-Assistance-of-Counsel Claims

Dantzler's IATC claim is a closer call, but it still falls short. Dantzler contends that his trial attorney rendered deficient performance by failing to secure and consult with a DNA expert, and that he was prejudiced because the defense was not equipped to rebut the prosecution's evidence. The warden disputes each point, arguing first that the IATC claim is procedurally defaulted and cannot be considered by a federal court. The warden then argues that, with respect to the merits, Dantzler has not overcome the strong presumption that trial counsel was competent

and that Dantzler's speculative assertions about the usefulness of a DNA expert are not enough to show prejudice. We disagree with the warden's claim that we are barred from considering the IATC claim but agree that it fails on the merits because Dantzler has not shown prejudice.

We do not rely upon the argument that Dantzler procedurally defaulted his IATC claim when he failed to raise it on direct appeal because the state court's opinion does not unambiguously rest on that default in rejecting the claim. The state postconviction trial court's opinion is the operative opinion for this purpose because that decision was upheld by form orders of the Court of Appeals and Supreme Court of Michigan, meaning the trial court's opinion was the "last reasoned decision" to reject Dantzler's claim. *See Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc). Although that opinion referred at the outset and at the conclusion to the standard for evaluating procedural default under MCR 6.508(D)(3), the court's analysis addressed only the merits of the three claims that Dantzler raised. There was never an explicit statement that Dantzler failed to raise any particular claim on direct appeal.[6]

Even if a habeas petitioner has failed to comply with a procedural rule that is adequate and independent, this does not foreclose review of a federal constitutional claim unless the rule was enforced by the state courts. *See Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011). Moreover, when a state court's judgment does not "'clearly and expressly' state[] that it[] . . . rests on a state procedural bar," then "procedural default does not bar consideration of a federal claim on . . . habeas review." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (citation omitted). That is the case here.

---

[6] Indeed, one of the three claims addressed on the merits by the state trial court (ineffectiveness of appellate counsel) obviously could not have been raised on direct appeal in the first place. There also was no discussion by the postconviction court of the prejudice requirement under MCR 6.508(D)(3)(b).

Dantzler's IATC claim ultimately fails on the merits, however. We assume for purposes of argument, without deciding, that trial counsel performed inadequately in not obtaining an independent DNA expert. But Dantzler has not met the burden of showing that "the deficient performance prejudiced the defense" by essentially "depriv[ing] the defendant of a fair trial," thus "render[ing] the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Dantzler argues that an expert could have conducted additional testing and provided context and responses to the prosecution's DNA experts to undermine their methodologies and conclusions. Such arguments are too generalized and speculative and Dantzler is therefore unable to meet the *Strickland* prong requiring him to show that "there is a reasonable probability that . . . the result of the proceeding would have been different," *id.* at 694; that is, that the likelihood of a different outcome is "substantial, not just conceivable," *Richter*, 562 U.S. at 112.

We review this question without applying AEDPA deference because the state court on collateral review did not reach the prejudice prong. *Hodges v. Colson*, 727 F.3d 517, 537 (6th Cir. 2013) (citing *Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007); *Rayner v. Mills*, 685 F.3d 631, 636–639 (6th Cir. 2012)).

First, Dantzler argued below that if an independent expert had tested the DNA, the expert could have generated complete DNA profiles of the other contributors, and "[t]hese other people could have been shown to have links to the crime." He does not appear to advance this argument on appeal, and in any event, this argument is speculative. It also neglects the evidence available to the jury that multiple individuals (including at least one related to Dantzler) were present at the scene and that the cap included multiple DNA sources (including the victim). Yet, that evidence did not sway the jury. Dantzler perhaps unwittingly illustrated just how hypothetical his argument is when he asserted that "[t]he unidentified, partial profile donors could have been *anyone*, and . .

. [f]urther testimony most probably would have identified someone else as wearing the hat." (Emphasis added.) Even if a DNA expert could have generated additional profiles and identified whom they belonged to, and assuming those individuals had a connection to Bernard Hill or "the posse," the DNA tests still could not determine the identity of the individual who wore the hat on the night of the murder and could not discount the probability that Dantzler's DNA was on the cap. Given the numerous variables, any possible benefit of additional testing is unknowable. The district court reasonably rejected this prejudice argument on the ground that "if someone else's DNA was connected to the hat, that would not eliminate the fact that Dantzler's was as well."

Although Dantzler's argument below in this regard focused on the DNA of persons other than Dantzler, on appeal Dantzler shifts the focus to whether Dantzler's DNA was on the hat. Dantzler argues that because his DNA was taken from a multi-source touch sample (i.e., taken from a surface that more than one person had touched) that included the DNA of other people, the government witness's testimony regarding the DNA profiles it had generated was questionable. In support, Dantzler relies upon the "PCAST" report (President's Counsel of Advisors on Science and Technology, Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (2016), https://perma.cc/CP88-JRCQ), which discusses how the interpretation of DNA profiles depends on subjective choices made by DNA analysts and concludes that "[i]t is often impossible to tell with certainty which alleles are present in the mixture or how many separate individuals contributed to the mixture, let alone accurately to infer the DNA profile of each individual." Dantzler also questions the way in which the prosecuting attorney stated the huge "1-in-2.3-quadrillion" unlikelihood as technically fallacious.

These two specific arguments were not made below, which supports the state's argument to us that Dantzler has forfeited the prejudice arguments made by him on this appeal. Generally

we do not address arguments raised for the first time on appeal. *Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014) (citing cases). Indeed, Dantzler appears not to have more than implicitly contended that a DNA expert could have undermined the idea that Dantzler's DNA was on the hat. He did point out that he had argued to the state judge, "I'm just going by the word of the prosecution that my DNA is inside this hat and also it could be more people inside this hat other than me and I wanted the hat tested." But in the section of his habeas brief arguing prejudice, he argued at some length that the "[p]robable findings if the hat were tested by defense experts" were that "[c]omplete DNA profiles could have been generated for at least two other people who wore the hat" and that "[t]hese other people could have been shown to have links to the crime," without suggesting that an expert could have undermined the conclusion that Dantzler's DNA was on the hat. To be sure, Dantzler has consistently maintained that without an independent DNA expert, his counsel was ineffective because he "could not meet the prosecutor's case which relied solely on DNA" and that Dantzler was "just going by the word of the prosecution that [his] DNA is inside this hat." But such general statements only assert prejudice without articulating what the prejudice was and that is not sufficient to meet Dantzler's burden. That burden is one of "affirmatively prov[ing] prejudice." *See Hodge v. Haeberlin*, 579 F.3d 627, 640 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 693).

We recognize that appellants may cite legal authority not cited below for arguments that have been made below, *see Reeser v. Henry Ford Hosp.*, 695 F. App'x 876, 882 (6th Cir. 2017), point out logical or policy-driven fallacies in the district court's opinion, or generally reason in ways that are more compelling than what was presented below, without running into the rule that arguments not raised below are forfeited. We may also take into account that defendant proceeded pro se below, *see McCormick v. Butler*, 977 F.3d 521, 528 (6th Cir. 2020), although his filing was

considerably more lawyerlike than some briefs by counsel that we see. But the new arguments regarding what amounts to prejudice in this case present a difference of kind rather than of degree. Dantzler, in short, argues a different kind of prejudice than the ones he argued below—evidence going to whether his DNA was on the hat, rather than evidence regarding the DNA of others.

In any event, Dantzler's new arguments that with the help of an independent expert he could have undermined the state's contention that his DNA was on the hat, while ably presented, are similarly speculative. He asserts that an expert could have shown why the prosecution's analysis of the cap's "multi-source mixtures of touch DNA is a fundamentally flawed science" and could have rebutted the prosecution's misuse of probability statistics. These arguments fall short because they require us to engage in impermissible conjecture.

Dantzler contends that an independent expert could have explained that the government experts' conclusions that Dantzler's DNA was in the sample were unreliable. The government's probability calculations, Dantzler argues, are unreliable because they depend on "subjective choices made by examiners." But Dantzler does not identify which "subjective choices," if any, an independent DNA expert would have attacked—let alone the extent to which those choices would have affected the probability calculations and whether the testimony would have been compelling enough to sway the jury. Dantzler does not offer any evidence, let alone a particular expert's testimony, identifying "the pitfalls [of] multi-source touch DNA analysis" or explaining how those "pitfalls" applied to his case specifically. Such speculation about how a hypothetical expert might have testified is not enough to establish prejudice. *See, e.g.*, *Keith v. Mitchell*, 455 F.3d 662, 672 (6th Cir. 2006); *Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007); *accord Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991).

Dantzler also argues that an independent expert could have equipped defense counsel to challenge the prosecutor's repeated misapplication of the 1-in-2-quadrillion ratio from the government's expert. The error here, Dantzler contends, is that the prosecution took Preston's statistic that "the probability of randomly selecting an unrelated individual with this DNA profile . . . is . . . one in two quadrillion in the U.S. African American population" to mean that there is a one in two quadrillion likelihood[7] that the DNA on the cap did not belong to Dantzler. As the Supreme Court has explained, this "assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample" is known as the "prosecutor's fallacy." *McDaniel v. Brown*, 558 U.S. 120, 128 (2010) (per curiam). The Court has also warned that

> [it] is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA. This faulty reasoning may result in an erroneous statement that, based on a random match probability of 1 in 10,000, there is a 0.01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

*Id.* at 128. The prosecutor here did not go so far as to argue that a DNA match equated with guilt. No fair reading of the transcript would support such an inference. Indeed, the prosecutor made clear that its theory rested on the DNA evidence, Dantzler's motive, and the testimony of Burt, Bernard Hill's mother.

Even if the prosecutor succumbed to the prosecutor's fallacy and trial counsel was unable to rebut the flawed presentation of evidence, Dantzler still cannot show how he was prejudiced because he offers no evidence as to the true actual-match probability. As one of our sister circuits expressed, even where probability data may be exaggerated, the actual match may still be "so

---

[7] Or, as the prosecutor incorrectly repeated, "one in 2.3 quadrillion."

improbable that an . . . inappropriate data base does not prejudice a defendant because the true probability would have been more than enough to persuade a jury that the defendant was the source of the evidence sample." *United States v. Chischilly*, 30 F.3d 1144, 1158 n.31 (9th Cir. 1994) (citation omitted), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014). The Supreme Court's opinion in *Brown*, while not directly on point, is also instructive here. In that case, the petitioner challenged the sufficiency of the evidence supporting his conviction for rape, based in part on his DNA profile, with an expert report that identified trial errors that included the prosecutor's fallacy. *See Brown*, 558 U.S. at 123–24, 129–30. While the Court ultimately held that this report from outside the trial record could not be considered as part of a sufficiency-of-the-evidence habeas claim, it opined, in dictum, that even if the court of appeals could have considered the report, it did not undermine the DNA evidence presented at trial. *Id.* at 132. Namely, though the state had conceded that its expert "overstated [the] probative value [of DNA evidence] by failing to dispel the prosecutor's fallacy," the petitioner's report still did not dispute that DNA evidence had matched the petitioner. *Id.* Here, too, there is nothing to dispute the prosecutor's conclusion that the DNA evidence matched Dantzler's. Dantzler himself does not contend that an independent expert could have meaningfully challenged the probability that Dantzler's DNA was in the cap. Indeed, Dantzler admitted the possibility that he had worn a cap like that one in the past. With no alternative probability data to cast doubt on the actual match, Dantzler's argument that he was prejudiced is, again, speculative. Accordingly, because Dantzler has not shown a "substantial" likelihood that the result of his trial would have been different but for his counsel's performance, he is not entitled to habeas relief based on his IATC claim. *Richter*, 562 U.S. at 112.

To the extent that Dantzler raises a free-standing claim that his appellate counsel was ineffective for failing to raise an IATC claim, this too must fail for lack of prejudice. Both Dantzler

and the warden agree "that the prejudice analysis for appellate counsel's ineffectiveness 'effectively merge[s] with the merits of the [trial-counsel] claim.'" Because Dantzler fails to show his trial counsel was ineffective, his claim that his appellate counsel was ineffective for failing to raise an IATC claim necessarily fails. *See Kelly v. Lazaroff*, 846 F.3d 819, 830–31 (6th Cir. 2017); *Powell v. Berghuis*, 560 F. App'x 442, 452 (6th Cir. 2013). Even if appellate counsel was deficient for not raising an IATC claim and seeking a *Ginther* hearing under Michigan law to develop the record for the IATC claim, without any indication of what such a hearing would reveal, we cannot say Dantzler was prejudiced by appellate counsel's performance.

We affirm the judgment of the district court.

**KAREN NELSON MOORE, Circuit Judge, dissenting in part.** I would conclude that Samuel Lee Dantzler merits federal habeas relief for his claims that his trial counsel and appellate counsel were constitutionally ineffective. I thus respectfully dissent.

Under *Strickland v. Washington*'s familiar two-prong ineffective-assistance-of-counsel (IAC) test, a defendant must show constitutional deficiency—"that counsel's representation fell below an objective standard of reasonableness"—and prejudice—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). Dantzler first raised his claims of ineffective assistance of trial counsel (IATC) and appellate counsel (IAAC) in state postconviction proceedings.

As the majority points out, Maj. Op. at 17, we review the Michigan trial court decision in state postconviction proceedings because that is the last reasoned state-court opinion that addressed Dantzler's two IAC claims, *see Guilmette v. Howes*, 624 F.3d 286, 288 (6th Cir. 2010) (en banc). The Michigan trial court addressed both IAC claims on the merits, R. 20-4 (Mich. Trial Ct. Op. at 3–4) (Page ID #1812–13), excusing any procedural default, *see Perreault v. Smith*, 874 F.3d 516, 522 (6th Cir. 2017). The state court, however, discussed the merits of only the deficiency prong of *Strickland* for the IATC claim. For the IAAC claim, on the other hand, the state court reasoned that Dantzler showed no deficiency and then summarily found that Dantzler "cannot show any possible prejudice from appellate counsel's decisions." R. 20-4 (Mich. Trial Ct. Op. at 4) (Page ID #1813); *see also* Maj. Op. at 17 & n.6. This solitary sentence constitutes a merits decision. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011). So we must apply 28 U.S.C. § 2254(d) deference to the deficiency prong but review de novo the prejudice prong for the IATC

claim, and we must accord § 2254(d) deference to both *Strickland* prongs for the IAAC claim. *See Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012); *see also* Maj. Op. at 17–19.

Doubtless, Dantzler's trial lawyer's failure to consult with, hire, or call a DNA expert was constitutionally deficient. *Cf.* Maj. Op. at 18 ("We assume for purposes of argument, without deciding, that trial counsel performed inadequately in not obtaining an independent DNA expert."). Counsel's dereliction was not trial strategy. *Cf. Strickland*, 466 U.S. at 689. The DNA in the hat was the sole physical evidence linking Dantzler to the crime scene. The "only reasonable and available defense strategy require[d] consultation with experts or introduction of expert evidence." *Richter*, 562 U.S. at 106; *see also Woolley v. Rednour*, 702 F.3d 411, 424–25 (7th Cir. 2012) ("[W]e can perceive no strategic reason why the importance of expert testimony would not have been apparent at the time of trial. . . . Here, defense counsel could not adequately represent his client simply by cross-examining the State's expert.").

I acknowledge that IATC claim's prejudice prong presents a close question. Dantzler presents compelling data about the unreliability of forensic analyses of touch DNA, *see* Appellant's Br. at 26–30, but we do not know what a defense DNA expert would have attested at Dantzler's trial, *cf. Stermer v. Warren*, 959 F.3d 704, 741(6th Cir. 2020); Maj. Op. at 21–22. Nor will we ever know, as one of the State's experts rendered the hat untestable. *See* Appellant's Br. at 15. Yet expert rebuttal testimony could have seriously undermined the reliability of touch DNA—the core of the prosecution's case. *See Hinton v. Alabama*, 571 U.S. 263, 273 (2014); *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011). I reiterate that we review de novo the prejudice issue; we are not constrained by § 2254(d) deference. *Cf. Stermer*, 959 F.3d at 739–41; *Dugas v. Coplan*, 428 F.3d 317, 334–43 (1st Cir. 2005); *Woolley*, 702 F.3d at 425–29. I thus part

ways with the majority's conclusion that Dantzler has not shown prejudice for his IATC claim. *See* Maj. Op. at 18.

Dantzler's appellate counsel also failed *Strickland*'s guarantees. *See Mapes v. Tate*, 388 F.3d 187, 191 (6th Cir. 2004) (listing nonexhaustive factors used to determine whether counsel on direct appeal was constitutionally ineffective). At bottom, Dantzler's trial counsel's failure to obtain a DNA expert was a "significant and obvious" issue that Dantzler's appellate counsel should have raised on appeal. *Id.* We cannot write off as strategy Dantzler's appellate counsel's decision to litigate the due-process claim and not the IATC claim. The Supreme Court precedent undergirding IAC claims based on a trial counsel's failure to call an expert is robust compared with the feebler caselaw that addresses trial courts' obligations to provide resources to criminal defendants under the Due Process clause. *Compare Hinton*, 571 U.S. at 274 ("The trial attorney's failure to request additional funding in order to replace an expert he knew to be inadequate because he mistakenly believed that he had received all he could get under [state] law constituted deficient performance."), *with Ake v. Oklahoma*, 470 U.S. 68, 76–77 (1985) ("[T]he Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy . . . ."). "[T]he omitted issue"—here, the IATC claim—"was clearly stronger than those presented"—here, the due-process claim. *Mapes*, 388 F.3d at 192; *see also* Maj. Op. at 16 ("Dantzler's IATC claim is a closer call [than Dantzler's due-process claim is.]"). Dantzler's counsel did not simply eschew a weaker claim to focus on a stronger one. I would thus conclude that Dantzler's appellate counsel's constitutionally deficient and prejudicial performance also merits habeas relief.

To conclude, I would grant Dantzler habeas relief on his two ineffective-assistance-of-counsel claims. I thus respectfully dissent in part.